UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

SEAN RODNEY ORTH,

　　　　　　　　　　　Petitioner,

　　v.

WARDEN HDSP, *et al.*,

　　　　　　　　　　　Respondents.

Case No. 3:15-cv-00131-MMD-CLB

ORDER

## I.　SUMMARY

This petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and filed by Petitioner Sean Rodney Orth is before the Court for adjudication of the merits of Petitioner's remaining claims. As further explained below, the Court denies Petitioner's habeas petition, grants him a certificate of appealability for Grounds Three and Ten, and directs the Clerk of the Court to enter judgment accordingly.

## II.　BACKGROUND

In a previous order, dated December 12, 2017, this Court described the crime, as revealed by the evidence at Petitioner's trial, as follows:

> The convictions arose out of Petitioner's arrest on the night of August 21, 2006, during which police officers conducted a search of the rental vehicle he was driving. During the search, officers located two loaded handguns in a duffel bag, a baggie of methamphetamine, and several empty baggies consistent with packaging used in the sale of narcotics.

> Present during the arrest was Marla Barker, petitioner's girlfriend. Although Barker was subject to an outstanding warrant for failure to appear, officers did not arrest Barker on the warrant at that time.

> Earlier in the evening, Petitioner and Barker had been with Petitioner's friend, Eric Meyer. The night before Petitioner's trial, Meyer and Petitioner had a conversation, which was recorded by the Washoe County Jail, in

which it appeared that Meyer planned to testify that the guns found in the rental vehicle were his. After this conversation, Reno Police Officers Silver and Lever arrested Meyer on a misdemeanor warrant and brought him back to the station for an interview. Meyer did not say much during the interview but did make some comments to the effect that the guns were his. Lever wrote a report about the interview, and Thomas swore out an affidavit aimed at securing a seizure order for Meyer's DNA.

Barker testified at the trial. Meyer, who was not disclosed until the night before trial, did not. [Footnote 3: The trial court found the disclosure of Meyer was untimely and therefore precluded his testimony. However, the court also stated that if it allowed Meyer to testify it would allow the introduction of DNA evidence that it had previously excluded pursuant to defense motion.].

(ECF No. 34 at 1-2 (internal citations omitted).)

On December 6, 2006, a jury found Petitioner guilty of two counts of possession of a firearm by an ex-felon, one count of possession of a controlled substance, one count of possession of a controlled substance for the purpose of sale, and one count of trafficking in a controlled substance. (ECF No. 19-2.) Because they were lesser-included offenses, the counts of possession of a controlled substance and possession of a controlled substance for the purpose of sale merged into the count of trafficking in a controlled substance. (ECF No. 20-1 at 41-42.)

Petitioner moved for a new trial, and an evidentiary hearing was held. (ECF Nos. 19-4, 20.) Petitioner's motion was denied. (ECF No. 20 at 96.) Petitioner was sentenced to three concurrent terms of life imprisonment with the possibility of parole after ten years. (ECF No. 20-2.) Petitioner appealed, and the Nevada Supreme Court affirmed. (ECF No. 21-1.)

Petitioner filed a state habeas petition, a first-amended state habeas petition, and a supplemental, counseled state habeas petition on September 15, 2009; February 24, 2010; and August 6, 2010, respectively. (ECF Nos. 21-3, 22, 22-2.) The state district court conducted an evidentiary hearing and denied the petition. (ECF No. 23-2.) The Nevada Supreme Court affirmed the denial. (ECF No. 23-8.) Petitioner moved for rehearing. (ECF No. 23-9.) The Nevada Supreme Court granted the motion, reinstated the appeal, and again affirmed the state district court's denial. (ECF No. 23-12.) Petitioner again moved

for rehearing. (ECF No. 23-14.) The Nevada Supreme Court denied the request. (ECF No. 23-15.)

Petitioner dispatched his federal habeas petition for filing on February 19, 2015. (ECF No. 8.) Respondents moved for clarification of the petition. (ECF No. 13.) Petitioner responded and thereafter, on March 24, 2016, filed a first-amended petition. (ECF Nos. 14, 15.) This Court denied Respondents' motion to clarify as moot. (ECF No. 33.)

Respondents moved to dismiss the first-amended petition. (ECF No. 16.) This Court denied, in part, and granted, in part, the motion. (ECF No. 34.) Specifically, this court determined that Ground Eleven was unexhausted; Grounds Three and Nine were exhausted; Ground Three was not procedurally defaulted; Ground Four was procedurally defaulted, but the cause and prejudice analysis would be deferred to this order; and the motion to dismiss Grounds One, Five through Eight, and Ten, insofar as they contained allegations not raised before the Nevada Supreme Court, was denied without prejudice. (*Id.* at 12.) This Court ordered Petitioner to file a motion to dismiss seeking partial dismissal of the unexhausted claim, a motion to dismiss the entire petition without prejudice in order to return to state court to exhaust the unexhausted claim, or a motion for other appropriate relief. (*Id.*) Petitioner moved to dismiss Ground Eleven. (ECF No. 35.) This Court granted the motion. (ECF No. 36.)

Respondents answered the remaining claims on April 11, 2018. (ECF No. 39.) Petitioner replied on July 19, 2018. (ECF No. 47.)

## III. LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings,

which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

## IV. DISCUSSION

### A. Ground One

In Ground One, Petitioner argues that his federal constitutional rights were violated when his appellate counsel failed to consult with him about the appeal and consider the issues that Petitioner wanted raised.[1] (ECF No. 15 at 5.) In Petitioner's state habeas appeal, the Nevada Supreme Court held:

> appellant claims that appellate counsel was ineffective for failing to consult with him about the appeal. Appellant fails to demonstrate that he was prejudiced because he failed to demonstrate that there were any claims that appellate counsel should have raised that had a reasonable probability of success on appeal. Therefore, the district court did not err in denying this claim.

(ECF No. 23-8 at 6-7; ECF No. 23-12 at 9-10.) This ruling was reasonable.

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish

---

[1]Petitioner also contends that his appellate counsel was ineffective for not raising the issues discussed in Grounds Two and Seven. (ECF No. 15 at 5.) This Court previously explained that Grounds Two and Seven are standalone claims, and Ground One does not contain any facts related to a failure to raise Grounds Two and Seven. (ECF No. 34 at 4 n.5.) Therefore, this Court held that it will consider the failures related to Grounds Two and Seven in the context of their respective grounds. (*Id.*)

prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the United States Supreme Court instructed:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*[ *v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'").

The *Strickland* standard is also utilized to review appellate counsel's actions: a petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and then "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Petitioner's appellate counsel testified at the post-conviction evidentiary hearing that she never spoke with Petitioner before filing the opening brief, never conferred with

him about his case, and never consulted with him about the facts and the issues. (ECF No. at 96-97.) Petitioner's appellate counsel elaborated that discussing an appeal with her client is "not [her] practice in appellate work" because she is "restricted to the record and [she] proceed[s] on the record." (*Id.* at 97.)

Petitioner contends that this testimony demonstrates that his appellate counsel was deficient. This contention may have merit. *See Strickland*, 466 U.S. at 688 (explaining that counsel has a "duty to advocate the defendant's cause and . . . consult with the defendant on important decisions and to keep the defendant informed of important developments"). However, because the Nevada Supreme Court denied Petitioner's claim on the basis that Petitioner failed to demonstrate prejudice and because that finding was reasonable, this court declines to address Petitioner's appellate counsel's alleged deficiency. *See id.* at 697 (explaining that a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other).

Beyond the two failures that Petitioner alleges in Grounds Two and Seven, which are discussed below, Petitioner fails to identify, with any specificity, any meritorious issue that he would have discussed with his appellate counsel had she consulted with him. Accordingly, as the Nevada Supreme Court reasonably concluded, Petitioner has not met his burden of demonstrating prejudice. *See Strickland*, 466 U.S. at 694; *Smith*, 528 U.S. at 285. The Court declines to grant Petitioner federal habeas relief for Ground One.

### B.    Ground Two

In Ground Two, Petitioner argues that his federal constitutional rights were violated because his appellate counsel failed to raise a claim of insufficient evidence on appeal. (ECF No. 15 at 9.) Petitioner elaborates that there was no proof that he had knowledge that the drugs or firearms were in the vehicle and there was no physical evidence tying him to the drugs or firearms. (*Id.* at 9-10.) In Petitioner's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant claims that appellant counsel was ineffective for failing to argue on appeal that the evidence of trafficking in a controlled substance and being a felon in possession of a firearm was insufficient. Appellant fails to demonstrate that appellate counsel was deficient or that he was prejudiced because the evidence supporting the convictions, when viewed in the light most favorable to the State, was sufficient to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. NRS 453.3385(1); NRS 202.360; *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *McNair v. State*, 108 Nev. 53, 56, 835 P.2d 571, 573 (1992). Therefore, the district court did not err in denying this claim.

(ECF No. 23-12 at 9.) This ruling was reasonable.

Natalie Brignand testified that her friend, Lisa Moore, asked her to rent a vehicle for Petitioner because Petitioner "didn't have a vehicle and he wasn't able to rent the car himself, being as how he didn't have a major credit card." (ECF No. 18-5 at 25-27.) Brignand did not know Petitioner at that time. (*Id.* at 26.) Brignand testified that she did not drive the rental vehicle, a gold Chevy Malibu, until after Petitioner's arrest. (*Id.* at 29.) Brignand also testified that she had no personal property in the vehicle. (*Id.*)

Marla Barker, who had been dating Petitioner for approximately two weeks before August 21, 2006, testified about Petitioner's actions on that evening. (ECF No. 18-7 at 20.) Barker explained that she went to dinner with Petitioner; Petitioner's friend, Eric Meyer; and Meyer's son. (*Id.* at 30, 37, 54.) Following dinner, outside of the restaurant, Barker explained that Petitioner and Meyer were standing "at the back of the car," with the trunk open, and she believed she saw Meyer "[e]ither put something in or take something out" of the Malibu's trunk. (*Id.* at 60, 69-70.) Barker explained that she "wasn't really paying that much attention. [She] just saw the movement and kept talking. (*Id.* at 70.)

Barker testified that she and Petitioner planned to accompany Meyer and his son to Meyer's residence. (*Id.* at 41.) Meyer's wife arrived at the restaurant to drive Meyer and Meyer's son. (*Id.*) Barker got in the Malibu with Petitioner, and Petitioner drove a block and a half to the Lamplighter bar, near where Barker's vehicle was parked. (*Id.* at 41-42.) Barker wished to drive her own vehicle to Meyer's residence, and Petitioner,

who wanted to make sure Barker followed him in her own vehicle, kept Barker's purse and dropped Barker off on the side of the road outside the Lamplighter bar. (*Id.* at 42, 56-57.) Barker ran across the street to get to her vehicle, and as she was doing so, she noticed police lights outside the Lamplighter bar and went back to see what was happening. (*Id.* at 42-43.)

Patrol Officer John Silver testified that Petitioner was under investigation by the Reno Police Department and that the police had probable cause to arrest Petitioner for a misdemeanor crime. (ECF No. 18-5 at 49, 53-54.) On August 21, 2006, while he was patrolling in the "Lake and Mill area," Officer Silver observed Petitioner driving a Malibu. (*Id.* at 55-56.) Petitioner pulled the vehicle over on Mill Street and "exit[ed] the gold vehicle and beg[an] . . . to walk southbound across Mill Street over towards the Lakemill Lodge." (*Id.* at 60-61.) Officer Silver pulled in behind the Malibu, and when Petitioner saw the patrol vehicle, Petitioner "turned around and walked back towards . . . the Chevy Malibu." (*Id.* at 61, 63.) When Petitioner reached the vehicle, "[h]e opened the door and leaned inside as if he was either putting an item in there or removing an item." (*Id.* at 63.) Petitioner then shut the vehicle's door and "again began walking across the street." (*Id.* at 64.) Officer Silver exited his vehicle, told Petitioner "to stop and to come towards" him, and then "placed [Petitioner] in handcuffs and sat him on the curb." (*Id.* at 64-65.)

Barker approached Officer Silver and Petitioner inquiring what was happening. (*Id.* at 65.) Barker's purse was in the Malibu, and she consented to a search of it. (*Id.* at 67.) A "clear [b]aggie that contained a crystal white substance" was found in Barker's purse. (*Id.* at 68-69, 71.) Barker testified that she did not know that the drugs were in her purse and explained that she told the police that they did not belong to her. (ECF No. 18-7 at 45.)

Officer Silver testified that the search of the Malibu also revealed "a large plastic Baggie" containing "a large amount . . . of another crystal white substance" found "in between the center console and the driver's seat." (ECF No. 18-5 at 74-75.) Maria Fassett, an employee of the forensic science division of the Washoe County Sheriff's

Office, testified that "the net weight of the crystalline substance" found in the large plastic baggie was 6.57 grams, and the substance found in the baggie in Barker's purse was .62 grams. (ECF No. 18-6 at 98-99, 105.) Fassett testified that both substances were identified as methamphetamine. (*Id.* at 106-107.)

Patrol Officer Joseph Lever testified that he assisted in the investigation on August 21, 2006, in part, by searching the trunk of the Malibu. (ECF No. 18-6 at 53, 55). Officer Lever testified that he "found a black duffel-style bag. And when [he] opened the black duffel bag, [he] found two handguns" and "an eyeglass case that contained multiple plastic [b]aggies, empty, that were similar in what's normally used to package narcotics." (*Id.* at 60.) A "men's button-up short-sleeve shirt," a men's-sized leather jacket, and a fanny pack were also found in the duffel bag. (*Id.* at 82, 90-91; *see also* ECF No. 18-7 at 25, 48 (testimony of Barker that Petitioner kept clothes in the trunk of the Malibu and that she saw Petitioner wearing the shirt found in the duffel bag "[t]he night before or - - could have been the two nights before or the night before" Petitioner was arrested).) One of the firearms was a ".357 revolver handgun" and the other was a "black semiautomatic gun." (ECF No. 18-6 at 65-66.) Officer Lever testified that "the significance of the firearms, coupled with the amount of narcotics, the package of material and everything else, led [him] to believe that . . . those items together would be definitely involved in the sales of narcotics." (*Id.* at 69.) Officer Lever also testified that "with the quantity found in the car being what it was, and the amount of empty [b]aggies, it would make [him] believe that the empty [b]aggies were going to be used to hold smaller quantities . . . so they could be sold." (*Id.* at 72.) There were "[n]o useable fingerprints" on the semiautomatic weapon or the drug-packaging materials and no fingerprints on the revolver. (ECF No. 18-6 at 108-09, 111-12 (testimony of Dean Kaumans, a forensic investigator with the Washoe County Sheriff's Office); ECF No. 18-7 at 1 (same).)

Officer Reed Thomas testified that he had been sporadically surveilling Petitioner on August 21, 2006, and had observed Petitioner driving the Malibu earlier that evening.

(ECF No. 18-7 at 76-78.) Officer Thomas obtained Brignand's consent to search the Malibu. (*Id.* at 82.) Petitioner told Officer Thomas that the items found in the vehicle were not his or Barker's. (*Id.* at 84.) However, Petitioner then told Officer Thomas "to get the DEA" because he could "buy 5 pounds of dope at two places in Nevada and two in California right now." (*Id.* at 85.) Patrol Officer Sean Schwartz testified that he found "$511 in one of [Petitioner's] pockets" during a pat-down search subsequent to Petitioner's arrest. (ECF No. 18-6 at 48-50.)

Petitioner was convicted of one count of trafficking in a controlled substance and two counts of being an ex-felon in possession of a firearm. (ECF No. 20-2 at 2.)

### 1.    Trafficking in a controlled substance

NRS § 453.3385(1) provides that "a person who knowingly or intentionally sells, manufactures, delivers or brings into this State or who is knowingly or intentionally in actual or constructive possession of . . . any controlled substance which is listed in schedule I, except marijuana . . . shall be punished" if the amount "is 4 grams or more." The Nevada Supreme Court's finding that there was sufficient evidence to convict Petitioner of trafficking in a controlled substance was reasonable.

Although Brignand rented the Malibu, the evidence demonstrated that she did not operate the vehicle or place any of her personal belongings in the vehicle before Petitioner's arrest. (ECF No. 18-5 at 25-29.) Instead, the evidence demonstrated that the Malibu was rented for Petitioner, and Petitioner had primary control of the vehicle during the entirety of the rental period. (*Id.*) The evidence also demonstrated that Petitioner was operating the Malibu before his arrest. According to Barker, Petitioner drove her from the restaurant to the Lamplighter where she exited the vehicle and ran across the street. (ECF No. 18-7 at 42, 56-57.) This is consistent with Officer Silver's testimony that he observed Petitioner driving the Malibu down Mill Street. (ECF No. 18-5 at 60). Officer Silver testified that Petitioner exited the vehicle, but when Petitioner noticed him, Petitioner "opened the door and leaned inside as if he was either putting an item in there or removing an item." (*Id.* at 63.) Thereafter, Officer Silver found "a large plastic Baggie" containing "a large

amount . . . of another crystal white substance" found "in between the center console and the driver's seat." (ECF No. 18-5 at 74-75.) That substance was found to be methamphetamine weighing 6.57 grams. (ECF No. 18-6 at 98-99, 105-06.) This evidence demonstrates that Petitioner knowingly and intentionally possessed methamphetamine in an amount greater than four grams. *See* NRS § 453.3385(1).

Petitioner contends that there was insufficient evidence demonstrating that he possessed the methamphetamine because there were other people in the vehicle who had an opportunity to leave the methamphetamine. (ECF No. 15 at 9-10 (citing *McGervey v. State*, 114 Nev. 460, 464, 958 P.2d 1203, 1206 (1998) (concluding "that the State's evidence was not sufficient to establish that McGervey exercised dominion and control over the marijuana at issue [because] a number of people had an opportunity to leave the marijuana in the living room"); *Sanders v. State*, 110 Nev. 434, 436, 874 P.2d 1239, 1240 (1994) (concluding that there was insufficient evidence demonstrating that the defendant knew about or exercised control over the controlled substance because many people had access to the motel room in which the controlled substance was found); *Konold v. Sheriff, Clark Cnty*, 94 Nev. 289, 290, 579 P.2d 768, 769 (1978) (reasoning that mere presence near the discovery of a narcotic is insufficient to show possession); *United States v. Crain*, 33 F.3d 480, 486 (5th Cir. 1994) ("[W]hen two or more people are occupying a place, a defendant's control over the place is not by itself enough to establish constructive possession of contraband found there.").) Indeed, this was Petitioner's defense at trial. (*See* ECF No. 22-5 at 198 (Petitioner's trial counsel's testimony at the postconviction evidentiary hearing).)

While Meyer and Meyer's son may have been in the Malibu earlier in the evening and Barker may have been in the Malibu before the stop, Officer Silver testified that Petitioner was operating the vehicle before the stop, and he observed Petitioner lean in through the driver-side door and either place an item or remove an item from the interior of the vehicle. (ECF No. 18-5 at 55-56, 63.) Because evidence is viewed "in the light most favorable to the prosecution," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), Petitioner's

argument that there was insufficient evidence that he possessed the methamphetamine lacks merit.

Because the Nevada Supreme Court's finding that there was sufficient evidence to convict Petitioner of trafficking in a controlled substance was reasonable, its finding that Petitioner's appellate counsel was not ineffective for failing to raise this claim on direct appeal was also reasonable. *See Strickland*, 466 U.S. at 688; *Smith*, 528 U.S. at 285; *Jackson*, 443 U.S. at 319 (concluding that on direct review of a sufficiency of the evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"); *Jones v. Barnes*, 463 U.S. 745, 754 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies *Anders*. Nothing in the Constitution or our interpretation of that document requires such a standard.").

### 2.     Ex-felon in possession of a firearm

NRS § 202.360(1)(b) provides that "[a] person shall not own or have in his or her possession or under his or her custody or control any firearm if the person . . . [h]as been convicted of a felony." The Nevada Supreme Court's finding that there was sufficient evidence to convict Petitioner of two counts of being an ex-felon in possession of a firearm was reasonable.

Officer Lever testified that he found a .357 revolver handgun and a black semiautomatic handgun in a duffel bag in the Malibu's trunk. (ECF No. 18-6 at 60, 65-66.) Although there were no fingerprints found on the weapons (ECF No. 18-6 at 108-09), the firearms were found in the trunk of the vehicle Petitioner exercised dominion and control over, Petitioner was driving the vehicle before the stop, and Petitioner was the sole person present near the vehicle when Officer Silver made contact. Additionally, Barker testified that Petitioner and Meyer were standing at the back of the Malibu with the trunk open just before Petitioner's arrest. (ECF No. 18-7 at 70.) And, importantly, a shirt,

which Barker identified as being one that Petitioner had previously worn, and a men's leather jacket were also found in the duffel bag. (ECF No. 18-6 at 82, 90-91; ECF No. 18-7 at 25, 48.) Moreover, Barker testified that Petitioner kept clothes in the Malibu's trunk, and Petitioner was private with the Malibu's trunk contents: "[h]e'd just quickly finish whatever he was doing and shut it." (ECF No. 18-7 at 25-26.) During the second part of the bifurcated trial, "certified proof of [Petitioner]'s prior conviction in the Second Judicial District Court for eluding a police officer in December 1998" was admitted. (ECF No. 19 at 60, 63.) This evidence demonstrates that Petitioner, who had previously been convicted of a felony, "possess[ed] or [had] under his . . . control" two different firearms. Nev. Rev. Stat. § 202.360(1)(b); *cf. Woodall v. State*, 97 Nev. 235, 236, 627 P.2d 402, 402 (1981) (holding that there was insufficient evidence that appellant possessed the firearm because it "was discovered in a truck occupied by both appellant and his companion[, t]he circumstances do not resolve who placed it there[, and a]ppellant's companion . . . acknowledged the weapon was his and that appellant knew nothing about its existence").

Because the Nevada Supreme Court's finding that there was sufficient evidence to convict Petitioner of being an ex-felon in possession of a firearm was reasonable, its finding that Petitioner's appellate counsel was not ineffective for failing to raise this claim on direct appeal was also reasonable. *Strickland*, 466 U.S. at 688; *Smith*, 528 U.S. at 285; *Jackson*, 443 U.S. at 319; *Jones*, 463 U.S. at 754.

The Court declines to grant Petitioner federal habeas relief for Ground Two.

## C.    Ground Three

In Ground Three, Petitioner argues that his federal constitutional rights were violated when the State withheld the Meyer interview, Officer Lever's report about the Meyer interview, and Officer Thomas' affidavit supporting the application for seizure of Meyer's DNA. (ECF No. 15 at 18.) Petitioner explains that he did not discover these items existed until the post-trial evidentiary hearing on his motion for a new trial and did not obtain copies of these documents until his state habeas proceedings had

commenced. (*Id.* at 21, 24.) Respondents argue that Meyer's interview statements that he owned the firearms found in the Malibu were false because one of the firearms was reported as being stolen, and even if Meyer did own the firearms, Petitioner still unlawfully possessed them. (ECF No. 39 at 9, 13.) Respondents also argue that Petitioner's trial counsel made a strategic decision not to call Meyer, and possession of the police reports and the interview would not have affected that decision. (*Id.* at 11.)

In Petitioner's state habeas appeal, the Nevada Supreme Court held:

> On appeal from the denial of his September 15, 2009, petition, appellant claims that the district court erred by denying his claim that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to provide him with transcripts of an interview conducted between the police and a witness, Eric Meyer, and by failing to provide information regarding a deal between the State and a witness, Marla Barker. Both of these claims were raised and rejected on direct appeal from appellant's judgment of conviction and sentence. *Orth v. State*, Docket No. 49522 (Order of Affirmance, September 25, 2008). The doctrine of the law of the case prevents further litigation of these claims and cannot be avoided by a more detailed and precisely focused argument. *See Hall v. State*, 91 Nev. 314, 315-16, 535 P.2d 797, 798-99 (1975). Therefore, the district court did not err in denying these claims.

(ECF No. 23-8 at 2.) In ruling on the petition for rehearing, the Nevada Supreme Court held:

> On July 30, 2014, this court entered an order of affirmance in the above captioned case that affirmed the district court's denial of appellant's post-conviction petition for a writ of habeas corpus. On September 15, 2014, appellant filed a petition for rehearing arguing that this court misapprehended material facts and controlling case law regarding the State's withholding of the police interview with a witness, Eric Meyer. Having reviewed the petition for rehearing, we have determined that rehearing of this matter is warranted. Accordingly, we grant the petition for rehearing and reinstate this appeal.
>
> In the July 30, 2014, order of affirmance, this court affirmed the district court's denial of appellant's claim under *Brady v. Maryland*, 373 U.S. 83 (1963), regarding a police interview with a witness named Eric Meyer. *Orth v. State*, Docket No. 62423 (Order of Affirmance, July 30, 2014). This court affirmed based on the doctrine of law of the case because this claim had previously been raised on direct appeal and it appeared that appellate counsel had provided this court with a copy of the interview between Meyer and police. *Id.* After reviewing the appendix, we have determined that the

interview provided on direct appeal was an interview between Meyer and defense experts rather than the interview with police.

Because this claim was raised on direct appeal, it is still subject to the doctrine of law of the case. To overcome the application of this doctrine, appellant must demonstrate the discovery of substantially new or different evidence. *See Hsu v. Cnty of Clark*, 123 Nev. 625, 630, 173 P.3d 724, 729 (2007). The interview with police was substantially different than the interview that occurred with defense investigators, and therefore, appellant has overcome the doctrine of law of the case.

However, in addition to being subject to the doctrine of law of the case, appellant's *Brady* claim was also procedurally barred by NRS 34.810(b) because it was a claim that could have been raised on direct appeal. Because this claim is subject to NRS 34.810(b), appellant was required to demonstrate good cause and prejudice to overcome the procedural bar. A violation of *Brady v. Maryland*, 373 U.S. 83 (1963), may provide good cause to overcome the procedural bars. *State v. Bennett*, 119 Nev. 589, 599, 81 P.3d 1, 8 (2003). A *Brady* violation occurs when "the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensured, *i.e.*, the evidence was material." *Mazzan v. Warden*, 116 Nev. 48, 67, 993 P.2d 25, 37 (2000). "[P]roving that the State withheld the evidence generally establishes cause, and proving that the withheld evidence was material establishes prejudice." *Bennett*, 119 Nev. at 599, 81 P.3d at 8. Evidence is material where there is a reasonable probability that the omitted evidence would have affected the outcome at trial. *Jimenez v. State*, 112 Nev. 610, 619, 918 P.2d 687, 692 (1996).

Appellant fails to demonstrate good cause to overcome the procedural bar because he failed to demonstrate that the interview was withheld at the time of his appeal from either trial counsel or appellate counsel. Trial counsel knew at the time of the hearing on the motion for new trial that a recording of the interview existed, therefore, he should have made a diligent investigation and received those recordings from the police. *See Steese v. State*, 114 Nev. 479, 494, 960 P.2d 321, 331 (1998). Appellant counsel further complicated matters when he provided this court on direct appeal with the wrong interview. Therefore, had trial and appellate counsel been more diligent, this claim would have been properly raised on appeal. Appellant did not make any claims of ineffective assistance of counsel in regard to trial and appellate counsel failing to provide this court with the interview on appeal. *See Hathaway v. State*, 119 Nev. 248, 252, 71 P.3d 503, 506 (2003) ("A claim of ineffective assistance of counsel may also excuse a procedural default"). Therefore, appellant failed to demonstrate good cause.

In addition to failing to demonstrate good cause, appellant also failed to demonstrate prejudice. The evidence presented at trial demonstrated that

appellant was the person with control over the vehicle and that appellant was with Meyer when he put "something" in the trunk. Had Meyer testified, a phone call recorded at the jail could have been used to impeach Meyer as it appears to show that appellant was coaching Meyer regarding the guns. Further, trial counsel testified at the evidentiary hearing that his investigators informed him that Meyer did not know how the guns got into the bag in the trunk and could not describe the bag. If Meyer did not know how the guns go into the bag, then that would create substantial credibility issues as the guns were found in a bag in the trunk. Therefore, appellant fails to demonstrate prejudice because he fails to demonstrate that the omitted evidence would have affected the outcome at trial. Accordingly, he fails to overcome the procedural bar, and the district court did not err in denying this claim.

(ECF No. 23-12 at 5.) This ruling was reasonable.

The first item that Petitioner alleges was withheld by the State was Officer Lever's December 4, 2006, report. In that report, Officer Lever indicated that he detained Meyer on an outstanding warrant and then transported him to the police station for an interview. (ECF No. 29-1 at 38-39.) Officer Lever described the interview as follows:

During this interview Meyer made statements that the handguns [Petitioner] were [sic] accused of possessing actually belonged to him and [Petitioner] had no knowledge that they were in the vehicle.

At one point during the interview I told Meyer that [Petitioner]'s DNA was located on one of the handguns and Meyer said that it was impossible because he was positive [Petitioner] had never touched the handguns. I showed Meyer the results from the Washoe County Crime Lab which describe how [Petitioner]'s DNA was the prominent DNA located on the handgun. Meyer then made statements that the results were manufactured and not true. During this interview, Meyer would not answer specific questions and he told me several times that the questions would be answered by his testimony in court.

I told Meyer several times during the interview that I wanted him to be truthful with me. After my interview with Meyer and after monitoring recent phone calls from [Petitioner], who is in custody at the Washoe County Jail, I believe that [Petitioner] has instructed Meyer to testify that the handguns were his even though this may not be the entire truth.

(*Id.* at 39.)

Similarly, the recorded police interview—the second item that Petitioner alleges was withheld by the State—demonstrated that Meyer claimed ownership of the firearms

found in the Malibu's trunk. (ECF No. 29-1 at 30.) In fact, Meyer explained that he had the box of shells for one of the firearms and would bring that box to Petitioner's trial. (*Id.* at 18.) Meyer stated that Petitioner "never even saw the gun. Didn't know the gun was there. Didn't touch the gun." (*Id.* at 18.) When questioned about whether Petitioner requested that he falsely claim ownership of the firearms, Meyer stated that Petitioner never put "words in [his] mouth." (*Id.* at 20.)

Following Meyer's interview, Officer Thomas filled out a seizure application for Meyer's saliva on December 5, 2006. (ECF No. 29-1 at 41-42.) This is the third item that Petitioner alleges was withheld by the State. Officer Thomas' telephonic affidavit that accompanied the application provided the following:

> Judge, we have a current criminal case uh, that was supposed to go or is supposed to go trial this morning, uh, regarding [Petitioner], that's Reno case number 06-33832, [Petitioner] was charged among other things with possession of stolen property, specifically a stolen handgun, uh a Springfield XD .40 caliber. Uh he was charged with that crime uh, following a uh, stop of him on August 22 of this year. Uh, he was to go to trial on that charge again, is going to trial on that charge this morning, uh, yesterday afternoon I was contacted by uh, the District Attorney who is handling that case, Tammy Riggs, who advised that uh, uh, [Petitioner]'s defense attorney had contacted her and advised that one of [Petitioner]'s associates uh, good friend by the name of Eric Meyer, uh, was going to come forward and testify that those guns are in fact his, or that this gun is in fact his. Um, naturally we needed to pursue this as aggressively as we possibly could and try to uh, verify that information and, and speak to Mr. Meyer. We subsequently loaded [sic], located him in the middle of the night, uh, this morning, and booked him on a misdemeanor warrant, took him to Reno PD and uh, attempted to talk to him about the fact that the guns were his. Uh, Mr. Meyer did admit uh, he did say that the uh, guns are mine, uh, specifically this stolen handgun, they're actually two guns involved, but uh, the stolen handgun, specifically uh, is what we're talking about here. He admitted that it was his and that he would say that in Court, uh, this morning . . . [W]e are attempting to verify, in our investigation through other resources as well as DNA, uh, that Mr. Meyer is actually the owner of this gun.

(*Id.* at 45-46.) Thereafter, Justice of the Peace Harold G. Albright authorized the seizure. (*Id.* at 46-47.)

As will be discussed in more detail in Ground Six and Seven, Petitioner's trial counsel untimely noticed Meyer as a witness because he was not aware of the potential exculpatory nature of Meyer's testimony. The state district court had previously determined that a piece of the State's DNA evidence would be excluded for being untimely, and because it was excluding one piece of DNA evidence, the remainder of the State's DNA evidence would also be excluded. After the state district court indicated that it would be inclined to allow all the State's DNA evidence if Petitioner insisted on calling Meyer to testify, Petitioner's trial counsel decided to proceed without calling Meyer.

During the post-conviction evidentiary hearing, Petitioner's trial counsel elaborated on his decision to forego presenting Meyer's testimony. (*See* ECF No. 22-6.) Petitioner's trial counsel's investigators spoke with Meyer the first morning of Petitioner's trial. (*See id.* at 55.) Petitioner's trial counsel's investigators informed him that Meyer was prepared to testify that Petitioner "did not own the guns that were found in the trunk." (*Id.* at 65-66; *see also* ECF No. 29-1 at 133 (Meyer's interview with Petitioner's trial counsel's investigators in which he said "[t]he guns are mine" and "I put the guns in the trunk").) However, Petitioner's trial counsel's investigators also informed him that Meyer "wasn't going to claim ownership of the bag and he couldn't describe the bag . . . , he didn't know anything about the bag." (ECF No. 22-6 at 82; *see also* ECF No. 29-1 at 132 (Meyer's interview with Petitioner's trial counsel's investigators in which he said "[i]t wasn't my bag").) Petitioner's trial counsel also testified that a recorded telephone call between Petitioner and Meyer was problematic because Petitioner described the firearms to Meyer during that telephone call. (ECF No. 22-6 at 78-79.)

"[T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory,

or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The materiality of the evidence that has been suppressed is assessed to determine whether prejudice exists. *See Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' of a different result [exists] when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678).

It is true, as Petitioner asserts, that Meyer's interview with Petitioner's trial counsel's investigators did not reveal the important fact that Petitioner lacked knowledge of the presence of the firearms, a fact that was presented by Meyer in the police interview. (ECF No. 29-1 at 127-140; ECF No. 29-1 at 18.) However, even if the State had disclosed the Meyer interview, Officer Lever's report about the Meyer interview, and Officer Thomas' affidavit supporting the application for the seizure of Meyer's DNA, Meyer would still not have been able to describe the bag in which the firearms were found, which according to Petitioner's trial counsel, would mean that "the jury would infer that [Petitioner] put those guns in the bag." (ECF No. 22-6 at 67.) Moreover, the disclosure of these items would also not have changed the fact that Petitioner described the firearms to Meyer during the recorded telephone call. (ECF No. 22-6 at 78-79.)

As the Nevada Supreme Court reasonably concluded, these issues would have created substantial credibility issues for Meyer. Because these credibility issues would have been present even with the disclosure of the withheld items, it cannot be concluded that Petitioner's trial counsel would have called Meyer to testify if these items had been disclosed, of even if he did call Meyer to testify, that the jury would have believed his testimony. Accordingly, as the Nevada Supreme Court reasonably concluded, Petitioner failed to demonstrated prejudice because there was not "a reasonable probability that,

20

had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Therefore, the Nevada Supreme Court's conclusion that Petitioner failed to overcome the procedural bar was also reasonable. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("[C]oincident with the third *Brady* component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes."); *see also Cooper v. Neven*, 641 F.3d 322, 332-333 (9th Cir. 2011) (explaining that "in the context of *Brady* claims, the merits of the claim dovetail exactly with the cause-and-prejudice analysis" of Nevada's procedural rules).

The Court declines to grant Petitioner federal habeas relief for Ground Three.[2]

### D. Ground Four

In Ground Four, Petitioner argues that his federal constitutional rights were violated when the State committed prosecutorial misconduct. (ECF No. 15 at 50.) Specifically, Petitioner alleges that the State presented false testimony and arguments that were undermined by Meyer's police interview that the State failed to disclose. (*Id.* (citing *Miller v. Pate*, 386 U.S. 1, 6 (1967) (finding that "[t]he prosecution deliberately misrepresented the truth"); *Brown v. Borg*, 951 F.2d 1011, 1015 (9th Cir. 1991) ("The prejudice to a defendant's right to a fair trial is even more palpable when the prosecutor has not only withheld exculpatory evidence, but has knowingly introduced and argued false evidence.").)

In Petitioner's state habeas appeal, the Nevada Supreme Court held:

---

[2]Petitioner also argues that the withheld evidence was material because it could have been used to impeach various officers' testimonies at the motion for a new trial evidentiary hearing that Meyer did not say anything exculpatory during his police interview. (ECF No. 15 at 33.) Even if the withheld evidence could have been used to impeach the various officers' testimony, the state district court denied Petitioner's motion for a new trial on a different issue—there was no evidence that the police had made a deal with Barker to get her to testify at Petitioner's trial. (*See* ECF No. 20 at 94-97.) This is discussed further in Ground Ten. Petitioner cannot demonstrate that impeaching the various officers' testimony on a tangential issue would have resulted in "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

> [A]ppellant claims that the State committed prosecutorial misconduct when it argued in closing arguments that no one else could have put the duffel bag in the car and that Meyer had no connection whatsoever to the car and evidence found there. Appellant failed to allege this claim in terms of him receiving ineffective assistance of counsel. Therefore, to the extent that appellant attempted to raise this claim as an ineffective-assistance-of-counsel claim, he failed to provide cogent argument. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987). Further, to the extent that he raised this as strictly a prosecutorial misconduct claim, this claim should have been raised on direct appeal from his judgment of conviction and sentence and appellant failed to demonstrate good cause for his failure to do so. *See* NRS 34.810(1)(b)(2).

(ECF No. 23-12 at 10.)

The Court previously found Ground Four to be procedurally defaulted due to the Ninth Circuit's holding that NRS § 34.810(1)(b)(2) is an independent and adequate state ground for procedural default. (ECF No. 34 at 10 (citing *Vang v. Nevada*, 329 F.3d 1069, 1074 (2003)).) This Court then explained that such a default may be excused if the petitioner demonstrates cause for the default and prejudice resulting from it. (*Id.* (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).) Because Petitioner asserted that the *Brady* violation itself was cause for the default and because such a determination is intertwined with the merits of the case, the Court deferred ruling on Petitioner's cause and prejudice argument. (*Id.* at 11.) The Court now determines that Petitioner has failed to demonstrate cause for his default, and, as such, declines to excuse the default.

During the State's redirect examination, Officer Lever testified that he did not "have any reason to believe that [Petitioner] is excluded as the owner" of "the clothing found in the duffel bag." (ECF No. 18-6 at 53.) Later, during closing argument, the State commented:

> This defendant had two powerful handguns in his belongings when he was arrested. And we know that these are his belongings because his shirt is in that bag. You heard Marla Barker testify that that is his shirt; his shirt is in that black bag, and so are his guns. You heard the testimony of Officer Lever, who told you that is common practice, standard operating procedure for people who engage in drug trafficking, to have guns to protect

themselves from thieves and to protect their merchandise, which is the methamphetamine.

(ECF No. 19 at 19.) The State also made the following comments during its surrebuttal:

> [T]he defense is trying to attribute some of these things to a person named Eric Meyer, who, by the way, we have no evidence about in this case whatsoever. You heard him tell you, well, we know that Eric Meyer had the car one day and took it off by himself. Well, you recall when I was redirecting - - on redirect examination on Marla Barker, I asked her, "Did you ever see Eric Meyer take that car by himself?: And she said, "No. I was assuming, since I saw them together. Sean came home. I thought that was the only way that Eric could get home, was to take the car." "But did you see him take the car?" "No." Also, regarding Eric Meyer driving this vehicle to Bertha Miranda's, you will recall it's a block - - less than a block from Bertha Miranda's - - or, from the Lamplighter to Bertha Miranda's. So he's in there for seconds, at best.

(ECF No. 19 at 47-48.) Finally, the State argued that Petitioner "is the only person who ever has complete control of everything in the vehicle, including the items in the trunk, including the guns." (*Id.* at 51.)

The only new information that was gleaned following the disclosure of Meyer's police interview transcript, Officer Lever's report about that interview, and Officer Thomas' affidavit discussing that interview was Meyer's statement that Petitioner lacked knowledge of the presence of the firearms in the Malibu's trunk. (ECF No. 29-1 at 39, 48). Prior to the disclosure of this information, which happened during the state habeas proceedings, Petitioner learned at the motion for a new trial hearing, through the testimony of Officer Lever, that Meyer "made some comments to the effect that [the guns] were his" during the police interview. (ECF No. 20 at 59.) The State's questioning of Officer Lever and closing argument, which Petitioner takes issue with in this ground, do not touch upon the new information obtained from the withheld evidence—the knowledge of the weapons. Rather, the State's questioning of Officer Lever and closing argument only discuss possession of the weapons—facts that were known to Petitioner and his appellate counsel at the time his direct appeal was filed. Indeed, the motion for a new trial hearing was held on May 1, 2007, and Petitioner's opening appellate brief

was not filed until November 30, 2007. (*See* ECF No. 20; ECF No. 20-7.) Thus, Petitioner had the necessary information to raise this prosecutorial misconduct claim in his direct appeal. Accordingly, even if the State's questioning of Officer Lever and closing argument were improper, which does not appear to be the case, Petitioner cannot "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488. Because the alleged *Brady* violation itself does not establish cause, Ground Four is denied as being procedural defaulted.

### E.    Ground Five

Similar to Ground Three, in Ground Five Petitioner argues that his federal constitutional rights were violated when the State failed to disclose Meyer's police interview. (ECF No. 15 at 54.) While Ground Three challenged the Nevada Supreme Court's holding in his state habeas appeal, Petitioner challenges the Nevada Supreme Court's holding in his state direct appeal in Ground Five. (*Id.*) In that state direct appeal, the Nevada Supreme Court held:

> Orth claims that the district court erred in denying his motion for a new trial. He claims that he is entitled to a new trial . . . because the State failed to provide him with potential *Brady* material. Specifically, Orth claims he was prejudiced because the State withheld DNA evidence related to . . . Meyer and failed to provide him with transcripts of his conversation with Meyer and Meyer's subsequent interview with Officer Lever.

> A "district court's denial of a motion for new trial will not be reversed absent an abuse of discretion." [Footnote 40: *Steese v. State*, 114 Nev. 479, 490, 960 P.2d 321, 328 (1998).] The district court held an evidentiary hearing and . . . the record reveals that the State did not withhold any available DNA evidence, that Orth was aware of his own conversations with Meyer, and that nothing in the record before us suggests any probability that earlier disclosure of Officer Lever's interview would have led to a different result at trial. Therefore, we conclude that the district court did not err in denying Orth's motion for a new trial.

(ECF No. 13-3 at 18-19.)

When the Nevada Supreme Court reviewed Petitioner's *Brady* claim regarding the Meyer interview during his direct appeal, the Nevada Supreme Court reviewed

Petitioner's trial counsel's investigators' interview of Meyer, not the police interview of Meyer. (*See* ECF No. 23-12 at 3.) This was due to Petitioner's appellate counsel's mistake in providing the wrong interview. (*See id.* at 4.) In its review of Petitioner's *Brady* claim regarding the Meyer interview during his petition for rehearing of his state habeas appeal, the Nevada Supreme Court reviewed the police interview of Meyer. (*See id.* at 3; *see also* Ground Three *supra.*)

Petitioner appears to assert that the Nevada Supreme Court should have realized that his appellate counsel provided the wrong interview because she indicated the following in her opening appellate brief: "During the motion for a new trial hearing, Officer Lever testified that Eric Meyer admitted the guns were his." (ECF No. 15 at 54 (citing ECF No. 20-7 at 33-34).) However, Meyer claimed ownership of the firearms in his interview with Petitioner's trial counsel's investigators, so Petitioner's appellate counsel's citation to Officer Lever's testimony, which was based on the police interview, does not automatically reveal that the wrong transcript was provided. (*See* ECF No. 29-1 at 133 (Meyer's interview with Petitioner's trial counsel's investigators in which he said "[t]he guns are mine" and "I put the guns in the trunk").) Moreover, Petitioner's appellate counsel failed to provide the Nevada Supreme Court with the first page of Meyer's police interview, which added to the inability to notice the error. (*See* ECF No. 23-12 at 4 (notation by the Nevada Supreme Court in its order on Petitioner's petition for rehearing of the state habeas appeal that "[n]ot only was this court provided with the wrong interview, the first page of the interview was missing. The interview was merely labeled 'Recorded Interview of Eric Meyer.' Therefore, it was impossible for this court to determine who was speaking with Meyer, and it was not unreasonable for this court to believe that this was the interview between police and Meyer as was represented by appellate counsel").)

Petitioner also appears to argue that even if the wrong transcript was provided, the Nevada Supreme Court should still have found that his *Brady* claim was meritorious based on the various officers' testimony at the motion for a new trial hearing. (ECF No.

47 at 83.) Officer Thomas testified at the motion for a new trial hearing that Meyer did not make any statements to him while he was collecting his saliva sample, Officer Silver testified that he did not remember exactly what Meyer said in the police interview and that Meyer was limited in what he would answer, and Officer Lever testified that Meyer "made some comments to the effect that [the guns] were his." (ECF No. 20 at 27-28, 42, 59.) These statements from the motion for a new trial hearing mirror the statements from Meyer's interview with Petitioner's trial counsel's investigators—that Meyer was claiming ownership of the firearms found in the Malibu's trunk. (*See* ECF No. 29-1 at 133.) Because the various officers' testimony at the motion for a new trial hearing did not provide any additional information than what was already provided in the interview between Petitioner's trial counsel's investigators and Meyer, which was reviewed by the Nevada Supreme Court, Petitioner's argument lacks merit.

Based on the evidence before it—which, as explained previously, was Petitioner's trial counsel's investigators' interview of Meyer rather than the police interview of Meyer—the Nevada Supreme Court ultimately denied Petitioner's *Brady* claim on direct appeal after finding that earlier disclosure of the "police" interview would not have led to a different result. This was reasonable. At the hearing on Petitioner's motion for a new trial, Petitioner's trial counsel explained that, on the eve of trial, the State provided him with recordings in which Meyer claimed ownership of the firearms. (ECF No. 20 at 11.) Because Petitioner's trial counsel was already aware that Meyer was planning on claiming ownership of the firearms, and because the interview reviewed by the Nevada Supreme Court—the mistaken interview by Petitioner's trial counsel's investigators—revealed that same information, the Nevada Supreme Court's finding that disclosure of the "police" interview would not have changed Petitioner's trial was reasonable. The Court declines to grant Petitioner federal habeas relief for Ground Five.

//

//

//

## F.    Ground Six

In Ground Six, Petitioner argues that his federal constitutional rights were violated when his trial counsel failed to timely notice Meyer as a witness. (ECF No. 15 at 60.) In Petitioner's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant claims that trial counsel was ineffective for failing to timely notice Meyer as a witness. Appellant fails to demonstrate that counsel was deficient. At the evidentiary hearing, trial counsel testified that appellant refused to inform him of what Meyer would testify about. It was not until the night before the first day of trial that trial counsel learned what Meyer would testify about. Therefore, trial counsel was not deficient for failing to timely notice Meyer as a witness. Accordingly, the district court did not err in denying this claim.

(ECF No. 23-12 at 6.) As will be discussed, the Court finds that this ruling of the Nevada Supreme Court was reasonable.

On November 29, 2006, less than a week before the trial began, Petitioner's trial counsel indicated during the pretrial motions hearing that if the trial date was continued, he would be investigating some other possible witnesses. (ECF No. 17-15 at 163.) Petitioner's trial counsel also indicated that the list of witnesses "may be changing because [he has to] go to try to track down these witnesses." (*Id.* at 180.)

On the second day of trial, December 5, 2006, Petitioner's trial counsel made a record of his decision to refrain from calling one of those potential witnesses, Meyer: "I think it's in [Petitioner's] best interest to proceed without calling" Meyer, who "was discovered just recently before trial," because if Meyer testified, the state district court indicated that it was inclined to allow all the DNA results into evidence. (ECF No. 18-6 at 21.) Indeed, the state district court indicated:

> based upon the discovery statute . . . , there are deadlines and time periods within which people have to serve the written lists of the witnesses and why they intend to call them and what - - a summary of what they may say. And it's my understanding, according to what was relayed to me by [the State] is that - - and obviously, [Petitioner] would have known of the existence of Mr. Meyer in August of, you know, this year. And by not disclosing him, I think that, particularly in view of the fact that I excluded that DNA evidence, I think that that involves an intentional choice not to have disclosed that

name before, and I'm not going to allow that testimony on that grounds. And if I did, I probably would be inclined to reconsider my ruling on the DNA evidence.

(*Id.* at 20-21.)

During the post-conviction evidentiary hearing, Petitioner's trial counsel elaborated on how he learned about Meyer and his decision to refrain from calling him as a witness. Petitioner's trial counsel testified that he had contemplated calling Meyer as a witness because he had received some information that Meyer had been in the Malibu earlier in the day. (ECF No. 22-6 at 54, 57.) However, he explained that Petitioner never suggested that Meyer may have placed the firearms in the Malibu's trunk. (*Id.* at 77.) Instead, Petitioner indicated to his trial counsel that he would "'fill [him] in with stuff as the time comes by'" and "would discuss [something big] down the road." (*Id.* at 77-78.)

Before the trial began, a telephone call between Petitioner and Meyer was recorded at the jail. (*Id.* at 78.) Petitioner's trial counsel testified that he did not believe that Petitioner was suggesting that Meyer provide certain testimony during that telephone call, but he felt that Petitioner's description of the firearms to Meyer during that telephone call was problematic because "if they're Mr. Meyer's guns, he wouldn't need to have a description of them." (*Id.* at 78-79.) Petitioner's trial counsel heard these telephone calls on the evening before the trial began. (*Id.* at 78.)

That same evening, Meyer called Petitioner's trial counsel. (*Id.* at 55.) During the telephone call, Meyer asked Petitioner's trial counsel to tell him about the firearms, and Petitioner's trial counsel, in response, asked Meyer to tell him about the firearms since Petitioner's trial counsel was under the impression that Meyer was going to claim ownership of them. (*Id.* at 80.) Petitioner's trial counsel told Meyer that he would send his investigators to speak with him. (*Id.* at 55.) Following the investigators' discussion with Meyer, Petitioner's trial counsel was informed the morning of the first day of trial that Meyer was prepared to testify that Petitioner "did not own the guns that were found in the trunk." (*Id.* at 65-66.) That same morning, Petitioner's trial counsel also learned

that Meyer had been arrested. (*Id.* at 39-40.) However, Petitioner's trial counsel was never told that the police had conducted a recorded interview of Meyer; instead, he was given the impression by the State that Meyer did not say anything helpful to Petitioner's case. (*Id.* at 39, 42.) Petitioner's trial counsel testified that he never knew Meyer made comments to the police that "the handguns [Petitioner] w[as] accused of possessing actually belonged to [Meyer] and [Petitioner] had no knowledge that they were in the vehicle."[3] (*Id.* at 41.)

Petitioner's trial counsel explained that he did not wish to call Meyer as a witness because, based on his discussion with his investigators, Meyer "wasn't going to claim ownership of the bag and he couldn't describe the bag . . . , he didn't know anything about the bag." (*Id.* at 82.) Because the firearms were found in the bag, Petitioner's trial counsel was concerned that "the jury would infer that [Petitioner] put those guns in the bag," and he had no evidence to contradict that inference. (*Id.* at 67.)

Although, as Petitioner points out, Petitioner's trial counsel may have known about Meyer earlier in the case (*see, e.g.,* ECF No. 16-7 at 17-18 (notice by Petitioner at the preliminary hearing that Meyer was a possible witness)), the Nevada Supreme Court's holding that Petitioner's trial counsel was not deficient for failing to timely notice Meyer as a witness was reasonable. *Strickland*, 466 U.S. at 688. Petitioner's trial counsel testified that Petitioner never suggested that Meyer could provide testimony beyond the fact that he was present in the Malibu earlier in the evening. Indeed, it was not until the night before the trial started that Petitioner's trial counsel received a telephone call from Meyer and learned that Meyer was claiming ownership of the firearms. Accordingly, the record demonstrates that Petitioner's trial counsel was

---

[3]As was explained previously, Meyer explained in the recorded police interview that the firearms found in the trunk of the Malibu were his firearms and that Petitioner "never even saw the gun. Didn't know the gun was there. Didn't touch the gun." (ECF No. 29-1 at 18, 30.) Meyer also stated that Petitioner never put "words in [his] mouth," regarding the police's insinuation that Petitioner requested that Meyer falsely claim ownership of the firearms. (*Id.* at 20.)

unaware of Meyer's potential testimony in order to timely notice him as a witness. *Strickland*, 466 U.S. at 691 (1984) ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."); *see also Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) ("[C]ounsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence."). As such, the Nevada Supreme Court's denial of Petitioner's *Strickland* claim was reasonable. The Court declines to grant Petitioner federal habeas relief for Ground Six.

## G. Ground Seven

In Ground Seven, Petitioner argues that his federal constitutional rights were violated when his trial and appellate counsel failed to object to and raise on appeal the exclusion of exculpatory DNA evidence. (ECF No. 15 at 68.) Specifically, Petitioner explains that the State disclosed the results of one DNA test late, and after the state district court excluded that evidence, his trial counsel failed to object when the state successfully moved to exclude all DNA evidence. (*Id.*) In Petitioner's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant claims that trial counsel was ineffective for failing to object to the exclusion of all of the DNA evidence. Appellant fails to demonstrate that he was prejudiced. Because the DNA evidence that appellant claims should not have been excluded was neutral at best, appellant fails to demonstrate a reasonable probability of a different outcome at trial had the DNA evidence been admitted. Therefore, the district court did not err in denying this claim.
> . . .
> [A]ppellant claims that appellate counsel was ineffective for failing to appeal the district court's decision to exclude all of the DNA evidence. As discussed above, the DNA evidence was at best neutral, and appellant fails to demonstrate that there was a reasonable probability of success on appeal had appellate counsel raised this claim. Therefore, the district court did not err in denying this claim.

(ECF No. 23-12 at 6, 9.) This rejection of Petitioner's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established federal law.

At the pretrial motions hearing, Petitioner's trial counsel orally moved to exclude the firearm DNA results, which showed that Petitioner, by a finding of "1 in 240,000 . . . people," was the source of the DNA, because the DNA results were submitted close to the trial date. (ECF No. 17-15 at 6.) Petitioner's trial counsel explained that the untimely providing of those results did not allow him adequate time to "hire an expert" to interpret and analyze those results. (*Id.* at 6-7, 159.) The state district court disallowed the evidence, explaining:

> I'm going to suppress the DNA evidence because of the fact that it was disclosed at the time that it was disclosed. I would probably have suppressed that sua sponte, even if there had been no motion. It's just too strong of a piece of evidence to allow it to come in at the last minute and confront the defendant with it and force him to choose between his constitutional right to a speedy trial and to have evidence that he doesn't have the opportunity to challenge.

(*Id.* at 167-69.) The State then requested that all the DNA be excluded so that it would not be prejudiced by the fact that there was no DNA presented on the firearm. (*Id.* at 169.) The state district court agreed, indicating that it was "kind of inclined, if we're going to exclude some of it, we ought to exclude all of it." (*Id.* at 169-70.) The state district court then indicated that it would "give that a little thought" because "some of that DNA would tend to be exculpatory." (*Id.*) Before the trial commenced, the state district court held that it would allow all the DNA evidence, including the firearm DNA results, to be presented if Petitioner insisted on calling Meyer, his late-noticed witness. (*See* ECF No. 18-6 at 20; ECF No. 22-6 at 24, 55.) The DNA evidence was not presented at the trial, nor was Meyer called as a witness. (*See id.* at 55.)

Petitioner's trial counsel testified at the postconviction evidentiary hearing that a portion of the DNA results were favorable to the defense. Indeed, the report excluded Petitioner as the source of the DNA from the jacket swab and the shirt swab. (ECF No. 22-6 at 23.) Petitioner's trial counsel explained that he was planning to present this

favorable evidence at trial through Jeffrey Rolands, the Washoe County Crime Lab criminalist. (*Id.* at 24; *see also* ECF No. 18-1 at 3 (Petitioner's notice of witnesses, which included Jeffrey Rolands).) However, faced with the state district court's ruling before the trial commenced, Petitioner's trial counsel decided not to call Meyer as a witness and not have the entirety of the DNA evidence admitted for several reasons: first, he did not understand the late-disclosed firearm DNA results and Petitioner did not want to continue the trial date and waive his right to a speedy trial to allow his trial counsel the opportunity to consult an expert about the meaning of those results; and second, "[he] received some information related to Eric Meyer through [his] investigators that made [him] question whether or not [he] wanted to call him as a witness." (ECF No. 22-6 at 55-56.)

Although the jacket swab and shirt swab DNA results were favorable to Petitioner, the Nevada Supreme Court's conclusion that the overall results of the DNA were "neutral at best" was reasonable. Rolands testified at the postconviction evidentiary hearing that although Petitioner was excluded as being the source of DNA from the jacket swab and shirt swab, he "could not be excluded as a source of th[e] mix[ed]" DNA profiles obtained from the shirt cuttings, revolver bag swab, and fanny pack swab. (ECF No. 23 at 7-8, 10-13.) Because Petitioner was not excluded as a source of the mixed DNA profiles from the shirt cuttings, revolver bag swab, and fanny pack swab, the Nevada Supreme Court's conclusion that Petitioner failed to demonstrate prejudice to support his ineffective assistance of trial counsel and appellate counsel claims was reasonable. *See Strickland*, 466 U.S. at 694; *Smith*, 528 U.S. at 285. Thus, the Nevada Supreme Court's rejection of Petitioner's claims clearly withstands review, and the Court declines to grant Petitioner federal habeas relief for Ground Seven.

## H. Ground Eight

In Ground Eight, Petitioner argues that his federal constitutional rights were violated when his trial counsel failed to impeach Barker with five prior inconsistent statements and that such impeachment evidence was material given that Barker was a

significant witness. (ECF No. 15 at 77-80.) In Petitioner's state habeas appeal, the Nevada Supreme Court held:

> [A]ppellant claims that trial counsel was ineffective for failing to cross-examine Barker with her inconsistent statements. Appellant fails to demonstrate that trial counsel was deficient or that he was prejudiced. Appellant fails to demonstrate that Barker's statements were inconsistent. Further, he fails to demonstrate a reasonable probability of a different outcome at trial had trial counsel asked her about those statements. Therefore, the district court did not err in denying this claim.

(ECF No. 23-8 at 4; ECF No. 23-12 at 7.) The Nevada Supreme Court's rejection of Petitioner's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established federal law.

First, Petitioner argues that his trial counsel should have impeached Barker's trial testimony with her prior inconsistent statements from the pretrial motion hearing concerning his shirt. (ECF No. 15 at 77; ECF No. 47 at 91.) At the pretrial motions hearing, Barker testified that she believed that Petitioner "changed shirts out of the trunk . . . the evening of the 21st." (ECF No. 18 at 153.) Barker testified at the trial that she saw Petitioner wearing the shirt, identified at the trial as Exhibit 11, "[t]he night before or - - could have been the two nights before or the night before" Petitioner was arrested. (ECF No. 18-7 at 48.) These statements are not necessarily inconsistent. It is not clear that the shirt Barker earlier testified that she saw Petitioner remove on August 21, 2006, was the same shirt as Exhibit 11 at the trial.[4] And more importantly, Barker was not definitive in her trial testimony regarding the date that she saw Petitioner wearing Exhibit 11. Because Barker was doubtful when she even saw Petitioner wearing Exhibit 11, it cannot be determined that the impeachment value of asking Barker about her pretrial testimony would have been beneficial.

---

[4]To the extent that Petitioner argues that his trial counsel should have impeached Barker with the DNA results from the shirt because the DNA demonstrated that the shirt was not his, such a contention lacks merit. Although the shirt swab DNA was favorable to Petitioner, Petitioner "could not be excluded as a source of th[e] mix[ed]" DNA profiles obtained from the shirt cuttings. (ECF No. 23 at 7-8, 10-13.)

Second, Petitioner asserts that his trial counsel should have impeached Barker's trial testimony with her prior inconsistent statements from a police report about being present in the Malibu before the stop. (ECF No. 15 at 77.) Barker's written statement following Petitioner's arrest provided that she "was in this car tonight." (ECF No. 47 at 169.) At the pretrial motions hearing, Barker testified that she told the police that she was in the Malibu moments before Petitioner was stopped by the police. (ECF No. 18 at 135.) At the trial, Barker testified that, following dinner, she got in the Malibu with Petitioner, and Petitioner drove a block and a half before dropping her off on the side of the road outside the Lamplighter, near where her vehicle was parked. (ECF No. 18-7 at 41-42, 56-57.) Barker ran across the street to get to her vehicle, and as she was doing so, she noticed police lights outside the Lamplighter and went back to see what was happening. (*Id.* at 42-43.) Barker's pretrial and trial statements are consistent: Barker was in Petitioner's vehicle before the stop.

The only inconsistency that Petitioner points to comes from Officer Silver. Officer Silver testified at the post-conviction hearing that his post-arrest report prepared on August 21, 2006, provided the following:

> Barker stated her purse was on the front passenger seat of the vehicle and asked if she could retrieve it. I asked her why her purse was in the vehicle and she stated they had previously been at the Reno Hilton and Orth took her purse, placed it in his vehicle in order for her to have to meet up with him later in the evening. She drove her car to the Lakemill Lodge while Orth drove the Malibu. When she arrived she saw us taking him into custody.

(ECF No. 22-5 at 15, 44-45.) However, this was not Barker's direct testimony. Indeed, Barker's written statement, which was contemporaneously made with Officer Silver's report, provided the opposite and was consistent with her pretrial and trial testimony: she was "was in [Petitioner's] car." (ECF No. 47 at 169.)

Third, Petitioner asserts that his trial counsel should have impeached Barker's trial testimony with her prior inconsistent statements regarding a firearm being present in Petitioner's vehicle. (ECF No. 15 at 78.) Barker's written statement following Petitioner's arrest provided that "[t]o [her] nologe [sic] there was nothing in the car when

I got in it." (ECF No. 47 at 169.) During her pretrial interview with Officer Thomas, Barker explained that Petitioner kept his car very clear because he believed the police were following him. (ECF No. 21-4 at 38-39.) Later, at the pretrial hearing, Barker testified that she told the police that she did not believe that there was anything illegal in the vehicle, that she did not believe there were any weapons in the vehicle, and she never indicated to the police that there was a weapon under the seat. (ECF No. 18 at 131, 133-34.) At the trial, Barker testified that if a police vehicle or a "suspicious-looking car" drove by, Petitioner would "always feel under his seat." (ECF No. 18-7 at 27.) Barker explained that she felt that it was "[p]robably . . . a weapon" and explained that a weapon may have been located under the seat. (*Id.* at 28, 46; *see also* ECF No. 18-5 at 72 (testimony of Officer Silver at the trial that Barker "gave [him] information that there may be a gun in the vehicle").) Barker testified that she never actually saw a firearm under the front seat. (ECF No. 18-7 at 46.) Petitioner's trial counsel then asked Barker some follow-up questions during cross-examination:

> Q.   Isn't it true that you told the officers that you didn't believe there was weapons in the vehicle?
> A.   Um, I'm not sure if I told them yes or no. I believe I told them that there might be. I've never seen one.
> Q.   You never saw a weapon in the vehicle?
> A.   Huh-uh.
> Q.   And at no time did you tell them that there was a gun under the driver's seat, did you?
> A.   No.

(*Id.* at 59.) These statements are consistent. Barker explained that she believed there may have been a weapon in Petitioner's vehicle at some point due to his behavior, but she never saw a firearm and lacked concrete knowledge of a weapon being in the vehicle.

Fourth, Petitioner asserts that his trial counsel should have impeached Barker's trial testimony with her prior inconsistent statements about when she had previously observed Petitioner in possession of a firearm. (ECF No. 15 at 78-79.) Barker's written statement following Petitioner's arrest provided that "[w]hen [she] woke up one morning

there was a black gun in my room that clipped in the bottom" and "[w]hen [she] woke up it was gone." (ECF No. 47 at 169.) At the pretrial hearing, Barker testified that she told the police "that when [she] came home from work, he was asleep and there was a gun under [her] nightstand, and when [she] woke up, [Petitioner] was gone and so was the gun." (ECF No. 18 at 147.) Barker explained that this occurred the "[d]ay before, two days before [Petitioner's arrest]. [She] d[id]n't know. [She] wasn't keeping track of all that." (*Id.* at 148.) Then at the trial, Barker testified "either two nights before or the night before" Petitioner was arrested, she saw what she believed to be a firearm. (ECF No. 18-7 at 28.) She explained that she saw "the bottom part of" the firearm underneath her nightstand while Petitioner was sleeping. (*Id.* at 29.) When Barker woke up the next morning, the firearm was gone. (*Id.* at 30.) At the state habeas hearing, Officer Thomas testified that he indicated in his November 14, 2006, report that Barker had "described a black handgun lying on her nightstand" and that this occurred on the day that Petitioner was arrested. (ECF No. 22-5 at 171, 174-175.)

Barker's statements are consistent. Indeed, she does not state when she saw the firearm on the nightstand in her written statement (ECF No. 47 at 169), and in her pretrial hearing testimony and trial testimony, Barker consistently explained that she saw the firearm on the nightstand either two nights before or the night before Petitioner's arrest. (ECF No. 18 at 148; ECF No. 18-7 at 28.) The only differing account is from Officer Thomas's report, which is not Barker's direct testimony, and is only slightly different, reporting that Barker said she saw the firearm on the nightstand the day Petitioner was arrested. (ECF No. 22-5 at 174.)

Fifth, Petitioner asserts that his trial counsel should have impeached Barker's trial testimony with her prior inconsistent statements about seeing Meyer put something in the trunk of Petitioner's vehicle. (ECF No. 15 at 80.) Barker's written statement following Petitioner's arrest provided that "[t]o [her] nologe [sic] there was nothing in the car when [she] got in it." (ECF No. 47 at 169.) At the pretrial motions hearing, Barker testified that she "believe[d Meyer] put something in the trunk [of Petitioner's vehicle]" after they

finished eating dinner and were standing in front of the restaurant, but she "d[id]n't know what" and "wasn't watching." (ECF No. 18 at 138.) Barker explained that this was "just an assumption." (*Id.* at 148.) And during cross-examination at the trial, Petitioner's trial counsel asked Barker if it was "true that [she] believe[d] Mr. Meyer put something in the trunk of the Malibu after dinner at Bertha Miranda's." (ECF No. 18-7 at 60.) Barker answered in the affirmative and explained that this occurred moments before Petitioner was stopped by the police. (*Id.*) Again, Barker's statements are consistent. Barker's written statement provided that she was not definitively aware of anything being in the vehicle, and her pretrial and trial testimonies provided that she believed Meyer may have put something in the trunk of the vehicle, but that belief was just an assumption.

In sum, the Court determines that the Nevada Supreme Court reasonably concluded that Petitioner's trial counsel was not deficient because Petitioner fails to demonstrate that Barker's trial testimony was impeachable on the basis that she made prior inconsistent statements. *See Strickland*, 466 U.S. at 688. Accordingly, the Nevada Supreme Court's rejection of Petitioner's *Strickland* claim clearly withstands review, and the Court declines to grant Petitioner federal habeas relief for Ground Eight.

## I.  Ground Nine

In Ground Nine, Petitioner argues that his federal constitutional rights were violated when his trial counsel failed to impeach Barker's testimony with the inducements and threats made by the police. (ECF No. 15 at 84.) Specifically, Petitioner argues that the police offered Barker money and an apartment and threatened to hold her in custody if she did not cooperate and testify against Petitioner. (*Id.*)

The Nevada Supreme Court's order affirming the denial of Petitioner's state habeas petition is silent as to the disposition of this claim. (*See* ECF No. 23-12.) 28 U.S.C. § 2254(d) generally applies to unexplained as well as reasoned state-court decisions: "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the

contrary." *Harrington*, 562 U.S. at 99. When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Id.* at 102.

During Barker's pretrial interview with Officer Thomas on November 6, 2006, Officer Thomas told Barker, "if you need my help, we can help through the victim's witness assistance center at the DA's office, I don't mind telling you that they were able to help Carrie get an apartment, that type of thing and there are some resources out there." (ECF No. 21-5 at 39.) The interview then proceeded as follows:

Thomas:    Yeah, he will be there with his attorney, so yeah he will be there but she is going to make it very clear to the jury that you don't necessarily want to be there either that basically you are under subpoena and basically you have to testify when you are under subpoena and if you don't testify then they end up issuing what is called a material witness warrant and they will come get you anywhere. And they will drag you into court, what they will do is leave you in custody until there is a new trial date set and then they will drag you into court and make you testify because you are under subpoena. That's the way we like to do things and that's a last resort, that's why I am glad that you are cooperative.

Barker:    And I have a place to live now.

Thomas:    You are stable and you have a place to live and again I offered to help you with that, that night, I wished you would have called me, I probably could have helped you, you were a victim at that point.

Barker:    I was going to leave town, I was so going to go the next day, I just didn't have . . . I went to Virginia City, I just didn't have enough money and I knew that.

Thomas:    And you know Marla and that maybe something we can still help you with, I can't make any promises but the witness . . .

Barker:    What would have you done if I did go to New York?

38

Thomas:         We would have gotten you a subpoena, like I say we would have gotten a material witness warrant and we would have flown you back here and we would have put you in jail until you testify.

Barker:            Put me in jail?

Thomas:         That's a material witness warrant, that is basically for someone who is not cooperative, that's what they have to do when people just don't want . . .

(*Id.* at 40-41.)

Petitioner's trial counsel did not question Barker about any of these statements at trial. (*See* ECF No. 18-7 at 50-66, 73-75.) Petitioner's trial counsel testified at the post-conviction hearing that defense counsel "should seek to present" evidence that "establish[es] or suggest[s] that the police treated [a witness] favorably." (ECF No. 22-6 at 30.) However, Petitioner's trial counsel testified that he "c[ould]n't think of a reason why [he] didn't bring [the foregoing conversation] up to [Officer Thomas]" during the trial "other than it appears that [Barker] never called him to receive any help." (*Id.* at 37.)

The Nevada Supreme Court could have supported its decision to deny Petitioner habeas relief because there is no evidence that Barker accepted Officer Thomas' offers of assistance. *See Harrington*, 562 U.S. at 99. Indeed, Barker did not seek or accept any beneficial treatment by the police. The evidence only shows that Officer Thomas made offers to Barker, which were never acted upon. Therefore, because there was nothing with which to impeach Barker, it cannot be concluded that Petitioner's trial counsel was deficient. *See Strickland*, 466 U.S. at 688; *see also Sully v. Ayers*, 725 F.3d 1057, 1073 (9th Cir. 2013) (finding that "the supposedly impeaching evidence that counsel failed to uncover and present . . . either had no impeachment value or was inculpatory"); *Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) (concluding that any "failures regarding impeachment of [the witness] are of comparatively little consequence").

As to the alleged threats made by Officer Thomas, it appears that he was merely informing Barker of the consequences she may have faced if she failed to comply with a witness subpoena. *See* Nev. Rev. Stat. § 50.205 (requiring, at the time of Petitioner's trial, that "[i]n case of failure of a witness to attend, the court or officer issuing the subpoena, upon proof of the service thereof and of the failure of the witness, may issue a warrant to the sheriff of the county to arrest the witness and bring the witness before the court or officer where the attendance of the witness was required"). Because Officer Thomas' statements to Barker appear to be advisements of the law rather than threats, it cannot be concluded that Petitioner's trial counsel was deficient in not asking Barker about these statements. *See Strickland*, 466 U.S. at 688.

Because the court determines that fairminded jurists would agree that Petitioner's trial counsel's actions were not inconsistent with prior decisions of the United States Supreme Court, *Harrington*, 562 U.S. at 102, Petitioner is not entitled to relief on Ground Nine.

### J.     Ground Ten

In Ground Ten, Petitioner argues that his federal constitutional rights were violated when the State failed to disclose that the police did not arrest Barker on an outstanding warrant and assisted in getting her warrant quashed. (ECF No. 15 at 88.) Petitioner explains that the State's failure to disclose these facts resulted in an inability to impeach Barker. (ECF No. 47 at 95.)

In Petitioner's direct appeal, the Nevada Supreme Court held:

> Orth claims that the district court erred in denying his motion for a new trial. He claims that he is entitled to a new trial because the jury was not made aware of a "deal" between Barker and the State and because the State failed to provide him with potential *Brady* material. . . . A "district court's denial of a motion for new trial will not be reversed absent an abuse of discretion." [Footnote 40: *Steese v. State*, 114 Nev. 479, 490, 960 P.2d 321, 328 (1998).] The district court held an evidentiary hearing and determined that there was no evidence of a deal between Barker and the State. Having carefully reviewed the record, we conclude that the district court did not abuse its discretion in this regard. . . . Therefore, we conclude that the district court did not err in denying Orth's motion for a new trial.

(ECF No. 13-3 at 18-19.) The Nevada Supreme Court's rejection of Petitioner's *Brady* claim was neither contrary to nor an unreasonable application of clearly established federal law.

A week after Petitioner's trial ended, on December 13, 2006, his trial counsel filed a motion for a new trial explaining, in part, that new evidence was obtained indicating that "Barker may have received a deal and/or leniency in exchange for her testimony." (ECF No. 19-4 at 5.) At a status hearing on Petitioner's motion, the state district court indicated:

> After the trial in this case, Deputy Carl Eckart, the bailiff at that time, and I were having a conversation, and the subject of Ms. Barker's testimony came up, and Deputy Eckart indicated to me that he had been told by one of the officers that there had been some kind of an arrangement made with Ms. Barker.

(ECF No. 19-6 at 6.) The state district court judge then recused himself "on the fact that [he] may be a material witness." (*Id.* at 18.)

After the case was transferred to another state district court judge, an evidentiary hearing was held on the motion for a new trial. (*See* ECF No. 20.) Officer Thomas testified that he was unaware at the time of Petitioner's arrest that Barker had an outstanding warrant. (*Id.* at 14, 15.) Rather, he learned about the misdemeanor failure-to-appear warrant in the following weeks. (*Id.* at 16.) Officer Thomas testified that he had the discretion to arrest Barker because it was only a misdemeanor warrant, and he did not arrest her, explaining that he "wasn't concerned about it[,] . . . [s]o [he] just told her how she could take care of it." (*Id.* at 17-18.) Officer Thomas explained that Barker was unfamiliar with the Reno Municipal Courthouse, so because he "had to be in court in that area anyway," he met her there. (*Id.* at 23-24.) Officer Thomas and Barker "spoke to a bailiff or somebody over there, and she just inquired about getting a new court date." (*Id.* at 23.) Officer Thomas testified that he viewed Barker as a victim and offered to put her in touch with the victim/witness assistance center, as he would have done for any

other similarly situated victim. (*Id.* at 32-33, 35.) Officer Thomas was not "aware of any deal [made] with Miss Barker." (*Id.* at 22.)

Officer Silver, a patrol officer at the time of Petitioner's arrest, testified that he was aware at the time of Petitioner's arrest that Barker had a warrant, and he explained that he decided not to exercise his discretionary ability to arrest her because she had been a victim of domestic violence. (*Id.* at 36-38, 47.) Officer Silver did not threaten to arrest Barker in order to get her to cooperate and offered her no assistance. (*Id.* at 39-40.) Officer Silver also explained that although drugs were found in Barker's purse, she was not in possession of that purse, and, as such, she was not arrested for possession of those drugs. (*Id.* at 39-40.)

Officer Lever testified that he learned about Barker's warrant sometime before Petitioner was transported to the jail and explained that he did not arrest her because she was leaving for New York in a few hours, there was no probable cause that Barker had committed any other crimes, and the ability to execute the arrest was discretionary. (*Id.* at 52-55.) Officer Lever did not offer Barker any kind of leniency or assistance in exchange for her testimony. (*Id.* at 56.) Similarly, Eric Koch, who was an officer trainee at the time of Petitioner's arrest, testified that he was not aware of any kind of leniency or special treatment given to Barker. (*Id.* at 68-69.) Carl Eckart, the bailiff assigned to Petitioner's trial, testified that Officer Thomas indicated to him that he wanted Barker to testify and that he relayed this information to the state district court judge. (*Id.* at 71-73.) Eckart explained that he did not tell the state district court judge that he heard that Barker had been offered a deal for her testimony, and the state district court judge misunderstood him. (*Id.* at 73-74.) The state district court denied Petitioner's motion for a new trial. (*Id.* at 96.)

As explained previously in Ground Three, "the suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady v*, 373 U.S. at 87. Because a witness's "'reliability . . .

42

may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

The Court determines that the Nevada Supreme Court reasonably concluded that there was no *Brady* violation because there was no deal offered to Barker for her testimony. The only support for the claim that a deal was offered to Barker was the state district court's understanding of comments made by his bailiff, Eckart. (*See* ECF No. 19-6 at 5.) However, Eckart testified that he never heard mention of a deal nor informed the judge of such; rather, the judge simply misunderstood his statement that Officer Thomas wanted Barker to testify as implying that a deal had been made. (*See* ECF No. 20 at 71-74.) In fact, the testimony presented at the evidentiary hearing on the motion for a new trial demonstrated that there was no deal offered to Barker. (*See id.* at 22.) Because there was no explicit or implicit deal made to Barker, there was no *Brady* violation. *See Giglio*, 405 U.S. at 155 ("[E]vidence of any understanding or agreement as to a future prosecution would be relevant to [a witness's] credibility"); *see also United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) ("While it is clear that an explicit agreement would have to be disclosed because of its effect on [the witness]'s credibility, it is equally clear that facts which imply an agreement would also bear on [the witness]'s credibility and would have to be disclosed.").

Petitioner appears to assert that the Nevada Supreme Court's holding was unreasonable because the lack of a quid pro quo is irrelevant; rather, the Reno Police Department's favorable treatment of Barker was enough to trigger disclosure requirements. (ECF No. 47 at 94 (citing *Benn v. Lambert*, 283 F.3d 1040, 1057 (9th Cir. 2002) ("The *Brady* rule requires prosecutors to disclose any benefits that are given to a government informant, including any lenient treatment.") and *Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985) ("Even mere 'advice' by a prosecutor concerning the future prosecution of a key government witness may fall into the category of discoverable evidence since it could constitute an informal understanding which could

directly affect the witness's credibility before the jury.")).) Officer Thomas, Officer Silver, and Officer Lever testified that they did not arrest Barker on the misdemeanor failure-to-appear warrant because such an arrest was discretionary, Barker had immediate travel plans, and Barker had been the victim of domestic violence. (ECF No. 20 at 17-18, 37-38, 52-55.) Instead, Officer Thomas met Barker at the Reno Municipal Courthouse, and they spoke with someone about getting her a new court date. (*Id.* at 23-24.) Although this evidence had impeachment value, it cannot be determined that Petitioner was prejudiced by the lack of disclosure. *See Strickler*, 527 U.S. at 281-82. Officer Thomas did not quash Barker's misdemeanor failure-to-appear warrant as Petitioner alleges. Rather, Officer Thomas guided Barker, who he viewed as being a victim, on how to properly deal with the warrant. It cannot be concluded that the result of Petitioner's trial would have been different had this evidence been disclosed and presented. *See Bagley*, 473 U.S. at 682. Thus, the Nevada Supreme Court's rejection of Petitioner's *Brady* claim was reasonable and clearly withstands review under AEDPA's deferential standard of review. Ground Ten does not provide a basis for federal habeas relief.[5]

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

---

[5]Petitioner also appears to argue for the first time in his reply brief that Officer Thomas could have been impeached at the trial if the information concerning Barker's warrant had been disclosed because Officer Thomas' testimony at the habeas evidentiary hearing demonstrated that he was lying regarding his discretion to arrest Barker. (ECF No. 47 at 95.) But the Court is restricted from considering evidence that was not a part of the record reviewed by the Nevada Supreme Court at the time it ruled on the issue. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court's procedural ruling was correct. *Id.*

Applying these standards here, the Court finds that a certificate of appealability is warranted for Grounds Three and Ten. Regarding Ground Three, although Meyer had credibility issues that would have been present even with the disclosure of Meyer's police interview, Officer Lever's report, and Officer Thomas' affidavit, reasonable jurists could debate whether prejudice ensued such that Petitioner overcame the procedural bar. Indeed, Petitioner's trial counsel may have decided to call Meyer as a witness based on this undisclosed, exculpatory evidence even in the face of Meyer's credibility issues because if the jury believed Meyer's testimony that Petitioner was unaware of the firearms in the Malibu's trunk, then Petitioner would likely have been acquitted of the two counts of being an ex-felon in possession of a firearm.

Regarding Ground Ten, reasonable jurists could debate this Court's conclusion that Petitioner was not prejudiced by the lack of disclosure of the Reno Police Department's favorable treatment of Barker. Although Officer Thomas did not quash Barker's misdemeanor failure-to-appear warrant, he did treat Barker favorably by meeting her at the Reno Municipal Courthouse and assisting her in getting a new court date. Additionally, none of the officers arrested Barker based on her failure-to-appear warrant. This undisclosed, impeachment-worthy evidence could have been used to cast doubt on the following portions of Barker's testimony: that she saw Petitioner and Meyer standing near the Malibu's open trunk just prior to the stop; that a shirt found in the duffel bag containing the firearms was one that Petitioner had previously worn; that Petitioner kept

clothes in the Malibu's trunk; that Petitioner was private with the Malibu's trunk's contents; that Petitioner would feel under his seat whenever a suspicious-looking vehicle drove by, which Barker believed meant that Petitioner probably had a weapon; and that Petitioner had what Barker believed to be a firearm on her nightstand before his arrest.

The Court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Petitioner's habeas claims on the remaining grounds.

## VI.    CONCLUSION

It is therefore ordered that the First Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (ECF No. 15) is denied.

It is further ordered that Petitioner is granted a certificate of appealability for Grounds Three and Ten. It is further ordered that a certificate of appealability is denied as to Petitioner's remaining grounds.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 26th day of December 2019.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE